# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| JOSE NATIVDAD PENA, | ) | |
| MARIA G. REYES, CONCEPCION PENA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14 C 4214 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| VILLAGE OF MAYWOOD, a municipal | ) | |
| corporation, OFFICER P. REILLY, Star #305, | ) | |
| Village of Maywood Police Officer, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On April 4, 2014, while responding to a call that there were "unwanted subjects" in a second-floor apartment in a building on Lake Street in Maywood, Illinois, Maywood police officer Patrick Reilly opened a door without knocking and was charged by a growling, 60-pound pit bull. As he backed away from the animal out onto the sidewalk, outside the building, Officer Reilly fired a single shot, wounding the dog and stopping the attack. The dog was treated by a veterinarian, was released the next day, and was able to walk around within two to three weeks; the dog is now fully recovered. The Penas, who were living in the building[1] and own the dog – although, notably, they had no license for it, had not neutered it, and kept it too close to a park, ignoring multiple city

---

[1] Oddly, the factual statements the parties have submitted do not answer the question of whether the plaintiffs had the legal right to be in the building or were trespassers or "squatters." Of course, if the Penas were occupying the property unlawfully, they would have no Fourth Amendment claim. *United States v. Curlin*, 638 F.3d 562, 565 (7th Cir. 2011). All we know about any of the plaintiffs is that Mr. Pena, Sr., has a Matricula Consular, an ID card used by Mexican citizens living abroad. (Jose Pena Dep., at 6). Born in 1960, he grew up "in Mexico and also here," coming to the United States nearly 40 years ago. (Jose Pena Dep., at 6). He cannot read or write any English, and can speak or understand almost no English. (Jose Pena Dep., at 9).

ordinances – are suing Officer Reilly and the Village of Maywood under 42 U.S.C. §1983 for violating their Fourth Amendment rights. Both sides have filed motions for summary judgment.

With the court drawing all inferences in the light most favorable to the non-moving party, the moving party must discharge its burden of showing that there are no genuine questions of material fact and that he is entitled to judgment as a matter of law. *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015); *Gerhartz v. Richert*, 779 F.3d 682, 685-86 (7th Cir. 2015). On cross-motions for summary judgment, the court must draw inferences "in favor of the party against whom the motion under consideration was made." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015); *McKinney v. Cadleway Props., Inc.,* 548 F.3d 496, 500 (7th Cir.2008). The fact that the parties file cross-motions for summary judgment does not necessarily mean that judgment is appropriate for one side or the other. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Local Union 150, AFL CIO*, 335 F.3d 643, 647-48 (7th Cir. 2003).

If the moving party has properly supported his motion, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial. *Spierer*, 798 F.3d at 507; *Cincinnati Life Ins. Co. v. Beyrer,* 722 F.3d 939, 951 (7th Cir.2013). Summary judgment is inappropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015); " *Nat'l Am. Ins. Co.*, 796 F.3d at 723. As was suggested in the order of December 16, 2015, there are problems with both sides' submissions in this case that preclude the entry of summary judgment in either side's favor.

## BACKGROUND

We take the facts from the parties' Local Rule 56.1 submission, *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015), which in turn draw extensively from the deposition

testimony of Officer Reilly. On April 14, 2014, Officer Reilly and his partner, Officer Flowers were dispatched to an apartment building with a report of multiple people "squatting" on the second floor of the building which was supposed to be vacant. (Plaintiffs' Statement, ¶ 4; Defendants' Statement ¶ 15; Reilly Dep., at 12). The officers had been sent to that building at 321 West Lake Street several times before. (Plaintiffs' Statement, ¶ 5; Defendants' Statement ¶ 14; Reilly Dep., at 14). The majority of the calls there were gang-related – and involved Jose Pena Jr., who up until recently was one of the plaintiffs in this matter. (Plaintiffs' Statement, ¶ 4; Defendants' Statement ¶¶ 13-14; Reilly Dep., at 15).

When they arrived, the two officers saw no one was outside the building, and they began to try all the doors to the building "to make sure they were all secure." (Plaintiffs' Statement, ¶¶ 13-14; Defendants' Statement ¶ 19; Reilly Dep., at 19). If any of the doors were not locked, Officer Reilly said that would have given him reasonable suspicion that someone was inside. (Reilly Dep., at 23). Between the two of them, the officers checked four doors before they found one that was unlocked. (Plaintiffs' Statement, ¶ 18; Defendants' Statement ¶¶ 20-22; Reilly Dep., at 37-38). Officer Reilly opened the door a crack, and he and Officer Flowers announced that they were police officers. (Plaintiffs' Statement, ¶ 23; Defendants' Statement ¶ 27; Reilly Dep., at 44). Officer Reilly can't recall if they knocked first – on that door or any of the others. (Plaintiffs' Statement, ¶ 24; Defendants' Statement ¶ 28; Reilly Dep., at 44). The officers could not see anything inside – it was dark. (Plaintiffs' Statement, ¶ 25; Defendants' Statement ¶ 28; Reilly Dep., at 44). No one responded to the officers. (Plaintiffs' Statement, ¶ 25; Defendants' Statement ¶ 27; Reilly Dep., at 44).

Officer Reilly then pushed the door all the way open. (Plaintiffs' Statement, ¶ 26;

Defendants' Statement ¶ 28; Reilly Dep., at 49-50). His hand was no longer on the doorknob. (Plaintiffs' Statement, ¶ 30; Reilly Dep., at 53). Neither officer had stepped into the building. (Defendants' Statement ¶ 29; Reilly Dep., at 47). Officer Reilly saw a couch inside, but from his angle, Officer Flowers saw a dog 8-10 feet inside and yelled, "dog." (Defendants' Statement ¶¶ 30-31; Reilly Dep., at 45). The dog was charging toward them; Officer Reilly didn't see it until it was four feet away. (Plaintiffs' Statement, ¶ 28; Defendants' Statement ¶ 32; Reilly Dep., at 49). The dog was growling as it charged. Officer Reilly attempted to shut the door but, by then, the dog was a foot away and he didn't believe he could. (Plaintiffs' Statement, ¶ 30; Defendants' Statement ¶¶ 33-34; Reilly Dep., at 52).

Officer Reilly backed up four or five steps onto the sidewalk; the dog continued to charge, growling and showing its teeth. (Plaintiffs' Statement, ¶ 31; Defendants' Statement ¶¶ 35-36; Reilly Dep., at 53-54). When the dog got to about a foot away from Officer Reilly, he fired one shot at the animal; it grazed the dog's head and lodged in its shoulder. (Plaintiffs' Statement, ¶ 33; Defendants' Statement ¶¶ 38-39). The dog fell to the ground, bleeding and whimpering. (Plaintiffs' Statement, ¶ 34; Defendants' Statement ¶ 40).

At his deposition, Officer Reilly said that he did not think there were exigent circumstances as he went around the building looking for an unlocked door.

> Q: Before you opened [the] door [of] the apartment the dog came out of, did you believe you had exigent circumstances?
>
> A: Probably not.
>
> Q: What legal basis did you believe you had to open [the] door [of] the apartment?
>
> \*   \*   \*
>
> A: We were there for a call of multiple subjects up on the second floor. We've had

4

numerous prior experiences with known affiliates of the Latin King gang organization that frequent that building right there, and there's been multiple calls of gang crime as far as shootings, shots fired, aggravated batteries, throwing bottles at cars and people, hitting people with bats. So given that prior knowledge, I felt that it was necessary to investigate further, as I did.

*       *       *

Q: Okay. Now all of those things occurred outside that building correct?

A: There was one domestic call I could recall, and that was about it, I believe.

Q: And was that one domestic call gang related?

A: It was a gang member who was involved with it, yes.

(Reilly Dep., at 77-79). Most of the illegal activity occurring near the building, on the corner, appears to have been "gang loitering." (Reilly Dep., at 84-85).

Officer Reilly explained that, if he had found that final door locked, that would have been the end of his efforts. At that point, he simply would have "see[n] if dispatchers could get a hold of the caller to get them back on the line, and if they said they'd be unable to, then we would have to code it out as if it was unfounded because there's no way to gain entry." (Reilly Dep., at 74).

In the aftermath, Mr. Pena, Sr., took the dog to the animal hospital where its wounds were treated and stitched. The hospital released the dog the following and gave the Penas some medication for the animal's pain. After 2-3 weeks, the dog could eat, sleep, walk, bark, and jump normally. (Plaintiffs' Response the Defendants' Statement, ¶¶ 54-56).

In Maywood, all dogs are required to be licensed; pit bulls must have a special license and be neutered. The Penas did not have any license for their dog whatsoever, let alone a pit bull license, and they had not had the animal neutered. Moreover, the Penas were living within 1500 feet of a park; pit bulls are not allowed to be kept that close to a park. (Defendants' Statement, ¶¶ 75-77;

Plaintiffs' Response the Defendants' Statement, ¶¶ 75-77). That's rather reckless behavior for pet owners whose animal has bitten a relative and *killed* another dog while being taken for a walk. . . (Defendants' Statement, ¶¶ 70, 72; Plaintiffs' Response the Defendants' Statement, ¶¶ 70, 72).

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants' motion begins by jumbling the standards for dismissing a complaint and for granting a motion for summary judgment. [Dkt. #60, at 5]. The defendants manage to right themselves and assert three arguments that they are entitled to summary judgment. First, they contend that the plaintiffs cannot, as a matter of law, establish that there was an illegal search. Second, they assert that the plaintiffs cannot, as a matter of law, establish that there was an illegal seizure. And finally, they argue that they are entitled to qualified immunity. After a review of the defendants' submissions on this matter, it becomes clear that their motion for summary judgment must be denied.

### A.

### Summary Judgment is Inappropriate on the Issue of Illegal Search

The defendants argue that, because Officer Reilly never entered the apartment, as a matter of law, there was not illegal search. As we understand it from Officers Reilly and Flowers, Officer Reilly tried the door handle, found it was unlocked, opened the door (a crack; maybe six inches), the two announced they were police officers, and then Officer Reilly swung the door all the way open. Neither officer remembers knocking on the door first. Both remember they did not announce they were police officers until after Officer Reilly opened the door.

The defendants' focus on whether Officer Reilly actually set foot into the apartment is misplaced. One "traditional protection" of the Fourth Amendment is the requirement that "officers

6

entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry." *Richards v. Wisconsin,* 520 U.S. 385, 387 (1997); *Green v. Butler*, 420 F.3d 689, 695 (7th Cir. 2005). The Supreme Court has made clear that "any physical invasion of the structure of the home, 'by even a fraction of an inch,' was too much." *Kyllo v. United States*, 533 U.S. 27, 37 (2001); *Silverman v. United States*, 365 U.S. 505, 512 (1961). "[T]here is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and" looks inside. *Kyllo,*, 533 U.S. at 37. That is because in the home, all details are intimate details, because the entire area is held safe from prying government eyes. *Id.* That's about what Officer Reilly said he did here: cracked open the door and looked inside.

From there, the defendants contend that Officer Reilly was making a "protective sweep of the exterior of the building." [Dkt. # 60, at 7]. They can't actually mean that because, obviously, a protective sweep of the *exterior* of a building does not necessitate going *inside* the building without a warrant. Still, they rely on *Maryland v. Buie*, 494 U.S. 325 (1990) for the proposition that a "protective sweep" is allowed as a "quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." [Dkt. #60, at 7]. But there was no arrest being made nor would there be. Moreover, as the Seventh Circuit has explained, *Buie* "assumes that the police already are lawfully present in the home to arrest its occupant and that a sweep is necessary to avert any immediate danger posed by others on the premises." *United States v. Arch*, 7 F.3d 1300, 1303 (7th Cir. 1993); *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 628 (7th Cir. 2008). So, the "protective sweep" doctrine cannot be the basis for excusing Officer Reilly's warrantless entry into the building.

With the validity of the entry into the building at issue, the applicable doctrine might be the

7

exigent circumstances doctrine. *Arch*, 7 F.3d at 1304. That's an argument the defendants raise in connection with their qualified immunity argument, but it must be addressed here.

First of all, as the Seventh Circuit explained in a case that the defendants rely on exclusively in their discussion of exigent circumstances, *Leaf v. Shelnutt*, 400 F.3d 1070 (7th Cir. 2005):

> There is no general rule permitting officers to enter a private residence without complying with the knock and announce principle whenever exigent circumstances are present; in fact, the Supreme Court [has] . . . forbade a blanket rule which would excuse compliance for an entire class of cases. . . . To hold that the knock and announce principle may be disregarded *any time* exigent circumstances justify a warrantless search would be to eviscerate [Supreme Court precedent].

*Leaf*, 400 F.3d at 1085 n.20. The question is whether the particular exigent circumstance justified Officer Reilly's disregard of the knock-and-announce principal.

The elephant in the exigent circumstances room is Officer Reilly's sworn testimony that he "probably [did] not" act out of exigent circumstances when he opened the door. According to him, he had the authority to enter the building without a warrant and without a "knock and announce" because there had been gang activity around the building in the past and that made it necessary to investigate further. The need, or desire, to investigate further, however, does not come up as qualifying as an exigent circumstance in either the cases defendants cite or the cases the court has seen. Exigent circumstances generally fall into the categories of danger to officers or others, the threat that evidence may be destroyed, or that a felon is fleeing or might escape. *Minnesota v. Olson*, 495 U.S. 91, 100, 85 (1990). *Leaf v. Shelnutt*, 400 F.3d 1070, 1084 (7th Cir. 2005); *United States v. Lenoir*, 318 F.3d 725, 730 (7th Cir. 2003). Officers likely encounter myriad circumstances where they'd like to investigate further or where further investigation might be warranted or helpful, but the Constitution curbs the satisfaction of their curiosity.

8

In the defendants' brief, they contend the exigent circumstances at work were the building's history of violent incidents and the need to make sure it was safe and secure. [Dkt. #60, at 7, 12]. But they only argue that this would have justified an "*exterior* protective sweep" [Dkt. #60, at 7, 12], not disregard of the knock-and-announce rule. The question thus remains: what exigent circumstances demanded that Officer Reilly throw open the door without knocking, announcing and waiting for an answer? "Violent history of the building" is rather vague. In most instances, the exigent circumstances exception requires a more particularized risk or threat. *See, e.g., Richards v. Wisconsin,* 520 U.S. 390, 393 (1997); *Jones v. Wilhelm*, 425 F.3d 455, 467 (7th Cir. 2005). We don't know how recently the incidents Officer Reilly mentioned occurred. We do know that the only thing that occurred *in* the building was a domestic violence incident. We know that most of the activity near the building demanding police attention appears to have been "gang loitering." We know that the call the officers responded to was for a non-violent crime, criminal trespass to property, a misdemeanor. 720 ILCS 5/21-3(a). And we know what Officer Reilly would have done if he found the door locked: he would have tried to get more information on the call, and if he couldn't, end his response and write it up as "unfounded." That doesn't sound like there was any perceived danger or risk of harm to anyone.

**B.**

**Summary Judgment is Inappropriate on the Issue of Illegal Seizure**

The defendants next argue that, because Officer Reilly merely wounded, rather than killed, the pit bull, there can be no illegal seizure. According to the defendants, a deprivation seizure has to be permanent in order to constitute a seizure. The case the defendants rely on exclusively, *United States v. Jacobsen*, 466 U.S. 109 (1984), held that "[a] 'seizure' of property occurs when there is

9

some meaningful interference with an individual's possessory interests in that property." 466 U.S. at 113. But while *Jacobsen* found that a destruction of a piece of property was permanent and therefore definitely affected possessory interests, it did not require that a deprivation be permanent in order to constitute a seizure. *Id.* at 124-25. Indeed, the court liken a seizure of property to a seizure of an individual: "meaningful interference, *however brief*." *Id.* at 113 n.5 (emphasis supplied).

Thus, the question remains whether the wounding of the pit bull – and its subsequent period of convalescence – amounted to a meaningful interference with the Penas' possessory interests. *See, e.g., Siebert v. Severino*, 256 F.3d 648, 655-56 (7th Cir. 2001)(seizure of horses for two days); *Phillips v. City of Chicago*, 2013 WL 4779185, at *1 (N.D. Ill. 2013)(". . . a police officer who unreasonably kills or *maims* a person's pet violates that person's Fourth Amendment rights."(emphasis supplied)). Defendants have not shown, as a matter of law, that it did not.

## C.

**Summary Judgment is Inappropriate on the Question of Qualified Immunity**

As earlier noted, defendants also argue that they are entitled to summary judgment on the basis of qualified immunity, *i.e.*, that Officer Reilly's conduct did not violate clearly established constitutional rights of which a reasonable officer would have known. *Saucier v. Katz,* 533 U.S. 194, 201-02 (2001); *Payne v. Pauley*, 337 F.3d 767, 775 (7th Cir. 2003).[2] Here, the defendants'

---

[2] As it has already been determined that defendants are not entitled to summary judgment on the question of whether Reilly violated the Penas' constitutional rights, *Payne*, 337 F.3d at 775 ("To determine whether [the] Officer . . . is entitled to qualified immunity, we must first ask whether the facts alleged, taken in the light most favorable to [plaintiffs], show that [the] Officer . . . violated a constitutional right."), we move directly to the second prong of the qualified immunity test.

qualified immunity argument fails on both the search and the seizure counts.

First, it cannot be argued that the knock and announce rule was not clearly established, *See, e.g., Richards,* 520 U.S. at 387 (1997)("officers entering a dwelling must knock on the door and announce their identity"), or that it was not clearly established that opening a door to a dwelling constituted a search. *See, e.g., Kyllo*, 533 U.S. at 37 ("[T]here is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and" looks inside.). The defendants can only hang their hats on exigent circumstances but, as already suggested, they have not sufficiently shown exigency. They claim Officer Reilly was permitted to conduct an exterior sweep of the building [Dkt. # 60, at 12] but, as we know, there was more than that. The issue here is whether exigent circumstance permitted Officer Reilly to dispense with knocking and announcing. And, as already indicated, the excuse that Officer Reilly feared for his safety or the safety of others is not compelling on the record as it now exists.

Similarly, it was well settled that even temporary seizures are within the scope of the Fourth Amendment, and that temporary seizures are within the scope of the Fourth Amendment, *Nelson v. Streeter*, 16 F.3d 145, 151 (7th Cir. 1994), and those would include the shooting of a pet. *See Viilo v. Eyre*, 547 F.3d 707, 711 (7th Cir. 2008)("The *Siebert* decision is enough to give police officers reasonable notice that unnecessarily killing a person's pet offends the Fourth Amendment."). And so, the question is whether the shooting was unnecessary. Under Seventh Circuit precedent, we must ask whether the wounding of the animal was unavoidable. *Viilo*, 547 F.3d at 710; *Sledd v. Lindsay*, 102 F.3d 282, 288 (7th Cir. 1996)(are facts "enough to show that the officer had unreasonably created the encounter that led to the use of force.). But that's a question the defendants fail to address in any meaningful way, even in their reply brief after the plaintiffs challenged them on the

point.

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Nothing that has been said regarding defendants' presentation of their summary judgment motion is meant to suggest that plaintiffs' motion for summary judgment should be granted. Indeed, the record counsels against it, and the Pena's motion must also be denied.

Like the defendants' motion, the Pena's motion has its own difficulties drawbacks. We focus on the issue of whether it is unreasonable for an officer to shoot a pit bull that is attacking him. Yes, Officer Reilly arguably erred by opening the door without knocking and announcing. "Police officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure cannot be immunized for the use of deadly force." *Estate of Starks v. Enyart,* 5 F.3d 230, 234 (7th Cir.1993). But thereafter, things escalated quickly and dangerously. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor,* 490 U.S. 386, 395 (1989); *see also Catlin v. City of Wheaton*, 574 F.3d 361, 369 n.7 (7th Cir. 2009)("On the other hand, we must make allowances for the defendants' split-second judgments. . . . Accordingly, our sister circuits have been reluctant to hold that an officer violates the Fourth Amendment where his or her split-second judgments exacerbate the need for force."). Judge – later Justice – Cardozo famously criticized the exclusionary rule, saying "[t]he criminal is to go free because the constable has blundered." *People v. Defore*, 242 N.Y. 13, 21 (1926). Surely, the constable who has blundered isn't to be mauled as well?

So, the question that remains is whether Officer Reilly acted unreasonably in shooting the pit bull. *See Bailey v. Schmidt*, 239 Fed. App'x 306, 308-09 (8th Cir. 2007)(". . . defendants did not

act unreasonably in killing [plaintiff's] dogs, given the uncontested evidence that all of the dogs either advanced on or acted aggressively toward the officers); *Altman v. City of High Point,* 330 F.3d 194, 206–07 (4th Cir.2003) (officer acted reasonably under circumstances in killing dog that had not attacked anyone but had displayed aggressive behavior). The cases the Penas have chosen to support their position that it was unreasonable as a matter of law are unpersuasive.

In *Viilo v. Eyre*, 547 F.3d 707, 711 (7th Cir. 2008), there was conflicting evidence over whether the dog was interfering with the police officers at all, and whether the dog was subdued by the officer's first two shots. *Id.* at 708-09. Here, the only evidence is that the Pena's pit bull charged Officer Reilly. Moreover, in *Viilo*, the officers involved knew ahead of time there would be a dog on the premises and had no plan other than to use lethal means to deal with it. *Id.* at 708 ("[The officer] prepared for this eventuality by arming himself with a shotgun because, as he later said, 'the best weapon for a dog is a shotgun through my experience.'"). Similarly, in *Flint v. City of Milwaukee*, 91 F.Supp.3d 1032 (E.D.Wis. 2015), the officers knew ahead of time that there were two mastiffs in the house but, nevertheless, failed to make any plan on how to deal with the animals through less than lethal means. *Id.* at 1042-43,1047-49. The opportunity to plan for dealing with a dog, and the failure to take advantage of that opportunity, is a theme that runs through dog-shooting cases and a significant part of the "reasonableness" calculus. *See, e.g., San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 976 (9th Cir. 2005)("... despite advance knowledge of the presence of two guard dogs, the full extent of the plan to protect the entry team from the dogs was to either "isolate" or shoot the dogs. The officers had no specific plan for isolating the dogs."). But here, Officer Reilly had no reason to anticipate or opportunity to plan for the pit bull that he encountered. He simply didn't know about the animal ahead of time. Perhaps if the Penas

had registered their dog, things may have gone differently, but they didn't. Beyond that, perhaps Officer Reilly could have shut the door, perhaps not. Perhaps he could have taken lesser measures, perhaps not. But, these are not questions that can be answered on summary judgment on the basis of the parties' submissions.

That leads to another nagging question left unresolved by the parties' submissions. As already noted, the Penas had not licensed, registered, or neutered their pit bull, violating three city ordinances. They kept him too close to a public park in violation of yet another ordinance. It's not as though they were oblivious to the reasoning behind these laws – the dog had bitten one of their relatives and, worse, had *killed* someone's pet dog while on a walk with Mr. Pena around the neighborhood. One cannot help but wonder whether the Penas have any legitimate possessory interest in the animal that would be the basis of a Fourth Amendment violation in the first place. *See, e.g., Allen v. Pennsylvania Soc. for Prevention of Cruelty to Animals*, 488 F. Supp. 2d 450, 466 (M.D. Pa. 2007)(". . . the property was contraband and that Allen could have no legitimate property interest in the animals. Without a constitutionally protected property interest in the animals, Allen cannot claim that their prolonged seizure violated the Fourth Amendment."); *see also Illinois v. Caballes*, 543 U.S. 405, 408 (2005)(". . . any interest in possessing contraband cannot be deemed 'legitimate,'"); *United States v. Goodwin*, 449 F.3d 766, 770 (7th Cir. 2006)(no legally protected interest in contraband); *United States v. Janik*, 723 F.2d 537, 547 (7th Cir. 1983)(no lawful property interest in unregistered gun). Moreover, if the Penas had followed the law rather than flout it and registered their pit bull, law enforcement might have had notice of the dangerous animal on the

premises and acted differently.[3]

## CONCLUSION

This is a case where the facts appear simple, but perhaps deceptively so. In the end, more was needed from both sides in terms of development of their positions with case law and dealing with the facts of this case, and their implications as well. The case law the parties chose to highlight in their submissions shows not that either side is entitled to the entry of judgment, but that they have not come to grips with those facts. An exterior protective sweep does not entail opening doors of a building. It's nearly impossible to believe that residents of a building are in danger when the response to a locked door would have been writing up the call as "unfounded." And it's completely impossible for an officer to plan for a pit bull attack when its owners choose to ignore registration laws.

The parties' cross motions for summary judgment [Dkt. #54, 59] are DENIED.

**ENTERED:** _____
**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 3/15/16

---

[3] If not a question of legitimate property interest, the Pena's keeping a pit bull, in violation of four ordinances, that had bitten at least one person and killed another person's dog certainly would seem to make the prospect of any significant damages unlikely.